**NATIONAL MINING ASSOCIATION,**
Appellant

v.

**UNITED STATES DEPARTMENT OF
THE INTERIOR, et al., Appellees**

Nos. 97–5202 to 97–5204, 98–5248.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 1999.

Decided May 28, 1999

Thomas C. Means argued the cause for the appellant. John A. MacLeod, J. Michael Klise and Harold P. Quinn, Jr. were on brief for the appellant

Ellen D. Katz, Attorney, United States Department of Justice, argued the cause for the federal appellees. Lois J. Schiffer, Assistant Attorney General, and Martin W. Matzen, Attorney, United States Department of Justice, were on brief for the appellees. John T. Stahr, Attorney, United States Department of Justice, entered an appearance.

Glenn P. Sugameli argued the cause for appellee National Wildlife Federation, et al. Thomas J. FitzGerald was on brief for appellee Kentucky Resources Council, Inc.

Before: WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Section 510(c) of the Surface Mining Control and Reclamation Act of 1977 (SMCRA) requires a surface mining permit applicant to file "a schedule listing any and all notices of violations of this chapter and any law, rule, or regulation of the United States, or of any department or agency in the United States pertaining to air or water environmental protection incurred by the applicant in connection with any surface coal mining operation during the three-year period prior to the date of application." 30 U.S.C. § 1260(c). The section further provides that "[w]here the schedule or other information available to the regulatory authority indicates that any surface coal mining operation owned or controlled by the applicant is currently in violation of this chapter or such other laws referred to this subsection [sic], the permit shall not be issued until the applicant submits proof that such violation has been corrected or is in the process of being corrected to the satisfaction of the regulatory authority, department, or agency which has jurisdiction over such violation." *Id.* To implement section 510(c) the Office of Surface Mining, Reclamation and Enforcement, United States Department of the Interior, (OSM) promulgated three final rules: the Ownership and Control Rule, 53 Fed.Reg. 38,868 (1988); the Permit Information Rule, 54 Fed.Reg. 8982 (1989); and the Permit Rescission Rule, 54 Fed.Reg. 18,438 (1989). In consolidated district court actions the National Mining Association (NMA) challenged all three final rules and the district court granted summary judgment to OSM in each action. *See National Wildlife Fed'n v. Babbitt,* Nos. 88cv3117, 88cv3464, 88cv3470, 1995 WL 704973 (D.D.C. filed Aug. 31, 1995);

*National Wildlife Fed'n v. Babbitt,* Nos. 89cv1130, 89cv1167, 1995 WL 702504 (D.D.C. filed Aug. 31, 1995); *National Wildlife Fed'n v. Babbitt,* Nos. 89cv1751, 89cv1811, 41 ERC 1529 (D.D.C. filed Aug. 31, 1995). In *NMA v. United States Dep't of Interior,* 105 F.3d 691 (D.C.Cir.1997), (*NMA I*) this court reversed the district court, holding that the Ownership and Control Rule's broad construction of the statute—that OSM could block permits based on ongoing environmental violations by "upstream" owners or controllers of the permit applicant—"conflicts with the plain meaning of section 510(c)," 105 F.3d at 693, which authorizes denial of a permit based on violations only of "downstream" operations, that is, ones that are "owned or controlled by the applicant," 30 U.S.C. § 1260(c). We further concluded that, "because the permit-information rule and the permit-rescission rule are centered on the Ownership and Control Rule, they too must fall." 105 F.3d at 693. Finding the ownership and control defect so fundamental to OSM's permit blocking regime, the court vacated all three rules *in toto,* without reaching NMA's objections to other aspects of the rules.

In response to the decision in *NMA I,* OSM issued an Interim Final Rule, 62 Fed.Reg. 19,450 (1997), (IFR), which largely reenacts the provisions of the three vacated rules but without the offending "upstream" provisions.[1] NMA challenged the new IFR in the district court by moving for enforcement of the *NMA I* mandate in the consolidated actions and by

filing a separate action, No. 97cv01418, to independently challenge the IFR. In each case NMA raised many of the objections we found it unnecessary to reach in *NMA I.* The district court denied the motions for enforcement, dismissed the consolidated actions and granted summary judgment in the newly filed IFR action, rejecting each of NMA's challenges. Reviewing the IFR *de novo,* as we must, *see National Coal Ass'n v. Lujan,* 979 F.2d 1548, 1553 (D.C.Cir.1992), we reverse the district court's summary judgment in No. 97cv01418, challenging the IFR. Because our review of that action disposes of the issues raised in Appeal Nos. 97–5202, 97–5203, 97–5204 (from the mandate enforcement denials in Nos. 88cv03464, *et al.*), we dismiss those appeals as moot.[2] We now address *seriatim* NMA's various objections to the IFR.[3]

## I. "Ownership and Control"

■ NMA asserts that the IFR reaches more broadly downstream than the statute permits in two respects.

First, NMA contends the IFR authorizes permit-blocking based on an applicant's ownership and control not only of a violating "operation," as the statute explicitly directs, but also of other entities that in turn own or control a violating operation. NMA is correct that the IFR authorizes permit blocking based on apparently limitless downstream violations. *See* 30 C.F.R. § 773.15(b)(1) ("Based on a review of all reasonably available information con-

1. OSM has since proposed new permit rules. *See* 63 Fed.Reg. 70,580 (Dec. 21, 1998) (proposed rules); 64 Fed.Reg. 23,811 (May 4, 1999) (reopening and extending comment period to May 10, 1999).

2. In an order filed August 20, 1997, denying NMA's motion to recall and enforce the mandate in *NMA I,* we stated: "[A]ny challenges appellant wishes to raise concerning the revised regulations should be presented in the first instance in the form of a new complaint." Accordingly, we resolve NMA's challenges in its appeal from the summary judgment in No. 97cv01418, the action NMA filed

(on June 20, 1997) specifically to challenge the IFR.

3. We do not address NMA's due process arguments which are addressed to OSM's 1994 procedural rules, *see* 43 C.F.R. §§ 4.1370–4.1377. The 1994 rules were not challenged below but were contested in a separate action, No. 88cv3464, an appeal from which is pending in this court. *See NMA v. Department of Interior,* No.96–5274 (D.C.Cir. filed Sept. 11, 1996). NMA has represented that it "would not oppose deferring consideration" of due process to the other appeal. Reply Br. at 20.

cerning violation notices *involving either the applicant or any person owned or controlled by the applicant,* ... the regulatory authority may not issue the permit if any surface coal mining and reclamation operation owned or controlled by the applicant is currently in violation...") (emphasis added); *id.* § 773.20 (authorizing regulatory agency to rescind permit "[w]hen the regulatory authority finds that the permit was improvidently issued" under 30 C.F.R. § 773.15(b)(1)). The statute itself, however, requires not that the violating operation be directly owned by the applicant but that it be either "owned *or controlled* by the applicant." 30 U.S.C. § 1260(c) (emphasis added). OSM has construed this language to include a downstream operation controlled, albeit not owned, by the applicant through ownership and control of intermediary entities. This view is consistent with, if not mandated by, the statutory language which, as noted, applies to any violating operations "controlled by the applicant," not only those directly owned by him. Accordingly, the agency's construction must be upheld. *See National Coal Ass'n v. Lujan,* 979 F.2d 1548, 1555 (D.C.Cir.1992) ("We must defer to [OSM's] interpretation of [SMCRA's] 'same penalties' provision unless the agency's reading is contrary to the statute's instruction, or is unreasonable.") (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Second, NMA asserts the IFR oversteps OSM's statutory authority insofar as it allows permit blocking based on a violation by an entity that the applicant *formerly* owned or controlled but does no longer. On this we agree. The statute expressly authorizes permit-blocking "when an operation owned or controlled by the applicant is currently in violation" of environmental laws. 30 U.S.C. § 1260(c). The legislative history indicates, as the

statutory language suggests, that the Congress intended to authorize a permit block only when an applicant, through ownership or control, is in violation *at the time. of application. See* S.Rep. No. 85–128 at 79 ("This subsection prohibits issuance of a mining permit if the application indicated the applicant *to be* in violation of the act or a wide range of other environmental requirements.") (emphasis added). For violations of an operation that the applicant "has controlled" but no longer does, and for which it therefore lacks.power to effect abatement, the Congress authorized permit-blocking only if there is "a demonstrated pattern of willful violations of this chapter of such nature and duration with such resulting irreparable damage to the environment as to indicate an intent not to comply with the provisions of this chapter." 30 U.S.C. § 1260(c). Thus, to the extent the IFR authorizes permit-blocks based on past ownership and control without such a pattern,[4] it contravenes the statute and cannot be upheld.

NMA also challenges the IFR's rebuttable presumptions of ownership or control set forth in 30 C.F.R. § 773.5(b). IFR section 773.5(b) "presumes" ownership or control from certain relationships between the applicant and a downstream entity "unless a person can demonstrate that the person subject to the presumption does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface coal mining operation is conducted." Under subsections (1) to (6) of section 773.5(b) the rebuttable presumption applies to a person who (1) is an officer or director of a company, (2) operates a surface coal mining operation, (3) controls the assets of an entity, (4) is general partner in a partnership, (5) owns 10 to 50 per cent of an entity or (6) owns or controls the coal to be mined (through lease, sublease or other contract) and has either the right to receive the coal after

---

4. The IFR does not explicitly authorize such a block but OSM has so applied it at least once. *See Virginia Iron, Coal & Coke Co. v. Babbitt,* C.A. No. 95–0227 (W.D. Va. filed Apr. 4, 1995) (dismissing for unripeness).

mining or the authority to determine the manner in which the surface coal mining operation is controlled.[5] NMA contends that the presumptions in subsections (1), (3), (4) and (5) are invalid. We agree as to subsections (1) and (5) but not as to subsections (3) and (4).[6]

█ In reviewing regulatory presumptions we must defer to the agency's judgment, see Atchison, Topeka & Santa Fe Ry. v. ICC, 580 F.2d 623, 629 (D.C.Cir. 1978), but "an evidentiary presumption is 'only permissible if there is a sound and rational connection between the proved and inferred facts, and when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact ... until the adversary disproves it,'" NMA v. Babbitt, 172 F.3d 906, 911–12 (D.C.Cir.1999) (quoting Secretary of Labor v. Keystone Coal Mining Corp., 151 F.3d 1096, 1100–01 (D.C.Cir.1998) (internal quotations omitted) (alterations in original)). "'If there is an alternate explanation for the evidence that is also reasonably likely, then the presumption is irrational.'" Id. at 912 (quoting Keystone Coal Mining Corp., 151 F.3d at 1101). The presumptions enumerated in subsections (1) and (5) fail this test because the relationships identified in them do not sufficiently indicate ownership or control.[7] Being an officer or director does not by itself enable an entity to control the company or its operations, as subsection (1) presumes. See American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 1.08(a)(c) (Proposed Final Draft 1992) ("A person is not in control of a business organization solely because the person is a director or principal manager of the organization"); Louis Loss & Joel Seligman, Securities Regulation 1724 & n.46 (3d ed.1990) ("[A] person's being an officer or director does not create any presumption of control.") (emphasis in original); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir.1984) ("A director 'is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed.'") (interpreting section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; quoting Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981); citing Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 194–195 (5th Cir.1979), modified, 611 F.2d 105 (5th Cir.1980) (per curiam)). Nor has OSM offered any basis to support subsection (5)'s presumption that an owner of as little as ten per cent of a company's stock controls it. While ten per cent ownership may, under specific circumstances, confer control, OSM has cited no authority for the proposition that it is ordinarily likely to do

5. The presumptions have been omitted from OSM's new proposed rules. See 63 Fed.Reg. at 70,583–84 ("The current presumptions that ownership or control exists would be replaced with a requirement that the regulatory authority make a finding of actual ownership or control.").

6. Because NMA has not specifically challenged the presumptions in subsections (2) and (6), we do not decide their validity.

7. SM points out that SMCRA itself requires that several of the same relationships be identified in a mining permit application. See 30 U.S.C. § 1257(b)(4) ("The permit application ... shall contain, among other things— ... if the applicant is a partnership, corporation, association, or other business entity, the following where applicable: the names and addresses of every officer, partner, director, or person performing a function similar to a director, of the applicant, together with the name and address of any person owning, of record 10 per centum or more of any class of voting stock of the applicant and a list of all names under which the applicant, partner, or principal shareholder previously operated a surface mining operation within the United States within the five year period preceding the date of submission of the application....."). The statute requires this, however, only for entities upstream from the applicant, not for downstream entities whose ownership or control may disqualify an applicant. In any event, to require identification of a particular relationship does not mean to presume control from it.

so.[8] Accordingly we hold that the presumptions in subsections (1) and (5) are invalid.[9]

By contrast the presumptions in subsections (3) and (4) are well-grounded. There is nothing strained about section (3)'s presumption that one "[h]aving the ability to commit the financial or real property assets or working resources of an entity" controls it. The ability to control assets goes hand-in-hand with control and is typically entrusted, along with general managerial authority, to a single officer, often the president. *See University of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1214 (1st Cir.1993) ("[T]he hand that holds all the purse strings presumably controls the dependent entity."); 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 466 (rev. ed.1998). As for subsection (4)'s presumption that control vests in each general partner, it naturally flows from "the tenet of partnership law that a general partner has control of partnership affairs as against the outside world." *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051, 1055 (D.C.Cir.1993) (citing Uniform Partnership Act § 9 (1914); *Picone v. Commercial Paste Co.*, 215 Miss. 114, 60 So.2d 590 (1952)); *see DSE, Inc. v. United States*, 169 F.3d 21, 32 (D.C.Cir.1999) ("A General Partner in a limited partnership has all the rights and powers of a General Partner in a General Partnership. Thus, a General Partner in a limited partnership is also presumptively in control of the limited partnership for purposes of the [SBA] affiliation regulation.").[10]

## II. Statute of Limitations and Retroactivity

NMA next contends the IFR violates the five-year statute of limitations governing penalty enforcement, 28 U.S.C. § 2462, because it authorizes permit-blocking based on violations more than five years old. In addition, it claims the IFR has retroactive effect in blocking permits based on violations that attached to an applicant before November 2, 1988, the effective date of the Ownership and Control Rule. We conclude the section 2462 limitation period does not apply to the permit blocks because the Congress intended to exempt them from its scope but agree that the IFR is impermissibly retroactive insofar as it reaches back before November 2, 1988.

Section 2462 provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. By the statute's express terms, its limitation period is inapplicable where "otherwise provided by Act of Congress"—and SMCRA so provides. Section 510(c) expressly directs the ap-

---

**8.** In its brief OSM referred the court to several regulations promulgated by other agencies but none of them presumes control based simply on a ten per cent ownership stake, although another Department of Interior regulation does so. *See* 30 C.F.R. § 206.101(b) ("based on the instruments of ownership of the voting securities of an entity, or based on other forms of ownership: ... (b) Ownership of 10 through 50 percent creates a presumption of control"). We do not consider the validity of section 206.101 here.

**9.** Because we invalidate these presumptions on the ground they do not sufficiently show

control, we need not address NMA's alternative contention that the presumptions violate established principles of stockholder and director liability.

**10.** We do not address NMA's contention that the IFR's rebuttable presumptions of ownership shift the burden of proof to the permittee in violation of the Administrative Procedure Act, 5 U.S.C. § 556(d). The challenged burden framework is set out not in the IFR but in OSM's procedural rules, *see* 43 C.F.R. §§ 4.1374(b), 4.1384(b), which are subject to appeal in a separate pending action. *See supra* note 3.

propriate regulatory authority to deny permits "[w]here the schedule or other information available to the regulatory authority indicates that any surface coal mining operation owned or controlled by the applicant *is currently in violation*" of environmental laws, irrespective of when the claim first accrued. 30 U.S.C. § 1260(c) (emphasis added). Because the statute expressly requires permit blocking based on current, ongoing violations, whenever first committed, we conclude that the Congress intended to exempt permit denials from section 2462's limitation period. *Cf. Mullikin v. United States*, 952 F.2d 920, 924–29 (6th Cir. 1991) (§ 2462 not applicable to assessing tax-fraud penalties under 26 U.S.C. § 6701 because "[i]t is the Court's view that it was the intent of Congress in enacting Section 6701 that there be no statute of limitations governing the assessment of penalties"), *cert. denied*, 506 U.S. 827, 113 S.Ct. 85, 121 L.Ed.2d 49 (1992); *Lamb v. United States*, 977 F.2d 1296 (8th Cir.1992) (following *Mullikin*).[11]

 The rule against retroactivity is not so easily avoided. An administrative rule is retroactive if it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *Association of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 864 (D.C.Cir.1992) (citation omitted). OSM's view of controller liability, first promulgated in the 1988 Ownership and Control Rule and retained in the IFR, imposes a "new disability," permit ineligibility, based on "transactions or considerations already past," namely pre-rule violations by mine operators over whom permit applicants acquired control before the rule's effective date.[12] Before the rule took effect there was no clear liability under the statute for violations by entities indirectly controlled by the applicant. While OSM's construction of section 510(c)—to impose liability for such downstream violations—is a reasonable one, *see supra* Part I, it is not mandated by the statutory language. Where before there was "a range of possible interpretations" of the statutory language—including imposing liability only for violations by the applicant's own, directly controlled operations—the rule established "a precise interpretation," which "in a sense changes the legal landscape." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423–24 (D.C.Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995). Applying the rule's specific interpretation to impose liability based on pre-rule acts therefore gives it retroactive effect which OSM can do only if authority therefor is "conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (citations omitted); *see also Health Ins. Ass'n of Am., Inc.*, 23 F.3d at 422–25. Because section 510(c) contains no "express terms" authorizing retroactive liability, we hold that the IFR is invalid insofar as it block permits based on transactions (violations and control) antedating November 2, 1988, the Ownership and Control Rule's effective date.

11. We recognize that the Fourth Circuit has held that section 2462 does apply to permit blocking under section 510(c). *See Arch Mineral Corp. v. Babbitt*, 104 F.3d 660 (4th Cir. 1997). The *Arch* court, however, based its holding on the premise that, contrary to OSM's position, a permit block is an "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture," without considering whether the Congress in enacting SMCRA intended to exempt such blocks from section 2462. Because we hold that the Congress intended no limitation period for the permit blocks, we need not decide whether such blocks are, as *Arch* held, "penal" or, as OSM maintains, "remedial."

12. In the case of pre-rule violations by operators over whom an applicant assumed *control after the rule issued*, the regulation is not retroactive because the applicant's disability is "in respect to" its assumption of control, a transaction occurring after the effective date.

## III. The Notice of Violation Schedule

■ Next, NMA asserts the IFR is *ultra vires* in that it directs applicants to submit information not expressly required to be included in a permit application under section 507(b) of SMCRA, 30 U.S.C. § 1257(b), or in the notice of violation schedule under section 510(c). This court has already held, however, "that the Act's explicit listings of information required of permit applicants [in sections 507 and 508] are not exhaustive, and do not preclude the Secretary from requiring the states to secure additional information needed to ensure compliance with the Act." *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514 (D.C.Cir.) (*en banc*), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981). Because section 510 is by its terms no more exhaustive than sections 507 and 508, we conclude the Secretary may require schedule information not specifically listed in any of the cited provisions of the Act.

NMA also contends the IFR's schedule provisions are arbitrary in requiring that an applicant submit information in the control of "third parties," namely, entities it is presumed to control under 30 C.F.R. § 773.5(b). Again we disagree. The IFR provides an escape hatch for an applicant who is unable to obtain the specified information. It can use that very inability to rebut the presumption of control and thereby avoid liability.

## IV. Improvidently Issued Permits

■ Next, NMA contends the IFR regulations authorizing a regulatory agency to suspend or rescind an "improvidently issued permit" (IIP), *see* 30 C.F.R. §§ 773.20(c), 773.21, are *ultra vires* because section 510(c) authorizes only denials of new permits. While it is true that section 510(c) does not expressly provide for suspension or rescission of existing permits, the IFR rescission and suspension provisions reflect a permissible exercise of OSM's statutory duty, pursuant to section 201(c)(1) of SMCRA, to "order the suspension, revocation, or withholding of any permit for failure to comply with any of the provisions of this chapter or any rules and regulations adopted pursuant thereto." 30 U.S.C. § 1211(c). The IIP provisions simply implement the Congress's general directive to authorize suspension and rescission of a permit "for failure to comply with" a specific provision of SMCRA—namely, section 510(c)'s permit eligibility condition. In addition, apart from the express authorization in section 1211(c), OSM retains "implied" authority to suspend or rescind improvidently provided permits because of its express authority to deny permits in the first instance. *See Gun S., Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir.1989) (although "neither the [Gun Control Act, 18 U.S.C. §§ 921 *et seq*.,] nor its regulations explicitly authorizes suspension" of permittee's firearm importation permit, Bureau of Alcohol, Tobacco and Firearms, which is authorized to grant permit, "must necessarily retain the power to correct the erroneous approval of firearms import applications") (citations omitted).

■ NMA also contends the IIP provisions impinge on the "primacy" afforded states under SMCRA insofar as they authorize OSM to take remedial action against operators holding valid state mining permits without complying with the procedural requirements set out in section 521(a) of SMCRA, 30 U.S.C. § 1271(a). On this point we agree.

■ Under SMCRA's state primacy regime, once a state permit plan is approved "the Secretary's role is primarily one of oversight" and "the state has the primary responsibility for achieving the purposes of the Act." *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d at 519; *see also* 30 U.S.C. § 1201(f) ("[T]he primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States . . . .").

Even the Secretary's oversight role is strictly circumscribed by the Act. "As long as the state properly enforces its approved program, it is the exclusive 'on the scene' regulatory authority," 653 F.2d at 519 (footnote omitted), and the Secretary's role is limited to making "such inspections of any surface coal mining and reclamation operations as are necessary to evaluate the administration of approved State programs," 30 U.S.C. § 1267(a). Nevertheless, "[i]n the event that a State has a State program for surface coal mining, and is not enforcing any part of such program, the Secretary may provide for the Federal enforcement, under the provisions of section 1271 of [title 30], of that part of the State program not being enforced by such State." 30 U.S.C. § 1254(b). Section 1271 sets out specific procedural requirements to be met before the Secretary may take remedial action against a state permittee (whether based on a federal inspection or section 1254(b) or in the course of enforcing a state program under section 1271(b) [13]). First, if the Secretary "determines that any permittee is in violation of any requirement of [SMCRA] or any permit condition required by [SMCRA]" that does not create an imminent danger to health and safety,[14] *then* the Secretary can issue a notice of violation setting a time period in which to abate the violation and providing opportunity for public hearing. 30 U.S.C. § 1271(a)(3). Only after the abatement period has expired and upon a "written finding ... that the violation has not been abated" can the Secretary suspend the violating operations, in an order setting out "the steps necessary to abate the violation in the most expeditious manner possible." *Id.* The IFR's IIP enforcement provisions, by contrast, permit OSM to issue a notice of violation to a permittee and to order cessation of mining operations by a specified date—unless the permittee by then undertakes remedial measures "to the satisfaction of the responsible agency"—when OSM "has reason to believe that a State surface coal mining and reclamation permit meets the criteria for an improvidently issued permit in [30 U.S.C.] § 773.20(b) or the State program equivalent, and the State has failed to take appropriate action on the permit under State program equivalents of [30 C.F.R.] §§ 773.20 and 773.21." 30 C.F.R. § 843.21(a). Because the Congress established specific procedures in section 521(a)(3) of SMCRA that the Secretary must follow before taking remedial action against a state permittee, we conclude those procedures must be used when OSM seeks to revoke a permit issued by the state under its state plan.

For the foregoing reasons, we dismiss as moot Appeal Nos. 97–5202, 97–5203 and 97–5204. In Appeal No. 97–5248 we reverse the district court's judgment insofar as it rejected NMA's claims that the IFR authorizes permit blocks based on violations by operations no longer controlled by an applicant, establishes rebuttable presumptions of ownership and control, allows impermissibly retroactive permit blocks and violates state primacy and we remand to the district court for remand to OSM to amend its permit block regime accordingly.

*So ordered.*

---

**13.** Section 1271(b) authorizes the Secretary, if he believes that violations have occurred because a state has failed to effectively enforce a state program, to assume enforcement of all or part of the state program, enforcing permit conditions, granting new or revised permits, and issuing necessary orders. 30 U.S.C. § 1271(b).

**14.** Section 521 provides for prompt remedial federal action in the case of a violation that creates an "imminent danger." *See* 30 U.S.C. § 1271(a)(1)-(2).