2006-NMCA-050

134 P.3d 785

**CHEVRON U.S.A., INC.,**
**Plaintiff–Appellant,**

v.

**STATE of New Mexico ex rel. DEPART-**
**MENT OF TAXATION AND REVE-**
**NUE, Defendant–Appellee.**

No. 24,518.

Court of Appeals of New Mexico.

March 9, 2006.

Certiorari Denied, No. 29,740, May 1, 2006.

Hinkle, Hensley, Shanor & Martin, L.L.P., Andrew J. Cloutier, Joel M. Carson III, Lucas M. Williams, Roswell, NM for Appellant.

Peifer, Hanson & Mullins, P.A., Charles R. Peifer, Robert E. Hanson, Albuquerque, NM, Cavin & Ingram, P.A., Sealy H. Cavin, Jr., Stephen D. Ingram, Albuquerque, NM, White, Koch, Kelly & McCarthy, Mary E. Walta, Santa Fe, NM, Eaves Law Firm, P.C., John M. Eaves, Albuquerque, NM, Sutin, Thayer & Browne, P.C., Derek V. Larson, Albuquerque, NM, Law Offices of Mickey D. Barnett, P.A., Mickey D. Barnett, Albuquerque, NM, for Appellee.

## OPINION

CASTILLO, Judge.

{1} In this case, we determine whether the New Mexico Department of Taxation and Revenue (Department) properly assessed a gas severance tax deficiency, plus interest and penalties, in the total amount of $1,781,690.35 against Chevron U.S.A., Inc., (Chevron) on gas produced and processed at the Eunice Gas Plant (Eunice Plant) and the Indian Basin Gas Plant (Indian Basin Plant) in New Mexico for the period beginning November 1, 1995, and ending October 1, 1998. Chevron is part owner of these processing plants. Chevron appeals from the order denying its motion for summary judgment and granting the Department's two motions for partial summary judgment. After entering the order, the district court granted Chevron's subsequent motion to dismiss Chevron's remaining claims with prejudice and entered final judgment on the order.

{2} Severance taxes on natural gas production are subject to various allowances, including deductions for the cost of processing the natural gas to remove liquid hydrocarbons and impurities. *See* 3.18.6.10 NMAC (2000) (describing the processing adjustment for natural gas). However, a number of gas producers own all or part of or are otherwise affiliated with the operators of the plants that process their natural gas. Because this relationship might result in an artificial valuation of processing costs, New Mexico has enacted various statutes and regulations to ensure fair valuation of natural gas in imposing severance taxes. *See, e.g.,* NMSA 1978, § 7-29-4.2 (1989) (providing for valuation by the Department under certain circum-

stances). These statutes and regulations are at issue here.

{3} Chevron has between a 10 percent and a 50 percent ownership interest in both the Eunice Plant and the Indian Basin Plant. Based on this interest and other facts, the Department found that Chevron was affiliated with the operators of these two plants. *See* 3.18.1.7(B)(2) NMAC (2000) (defining the term "affiliated persons"). Chevron does not raise the question of whether the Department correctly determined that Chevron owns this percentage in each of the processing plants. Instead, Chevron contends that 3.18.1.7(B)(2)(b) NMAC, which presumes that one company controls another when the first company owns 10 through 50 percent of the other company's stock, is irrational and hence invalid on its face. We first hold that Chevron did not meet its burden of showing that this regulation is invalid.

{4} Chevron's next argument relates to the interpretation of Section 7–29–4.2. Chevron contends that when the Department determines the value of a taxpayer's processing costs under the statute, the Department must compare the taxpayer's processing costs with the processing costs of other producers of "products of like quality, character and use which are severed in the same field or area." *Id.* Section 7–29–4.2 states that when two parties are affiliated or have engaged in *non—*arm's length transactions, the *value* that the Department sets for the products must be commensurate with "the actual price received" for similar products "severed in the same field or area." *Id.* This section then states that when there are no such sales, the Department must establish a "reasonable value." *Id.* We hold that the plain language of Section 7–29–4.2 does not mandate the way in which the Department must calculate processing costs—i.e., whether by a comparable value or by some other method. Rather, the final value of natural gas calculated by the Department must be commensurate with similar products. *See id.* We therefore affirm the district court's denial of summary judgment on this issue.

{5} We next move to the issues surrounding the district court's grant of summary judgment to the Department and denial of summary judgment to Chevron on whether Chevron was affiliated with the operators of the Eunice Plant and the Indian Basin Plant. We hold that there is no genuine issue of material fact as to Chevron's affiliation with the operators at issue, and we therefore affirm the district court's grant of summary judgment to the Department and the denial of Chevron's motion for summary judgment on the issues of affiliation and the absence of arm's length contracts with Chevron's processors.

## I.  BACKGROUND

{6} Under New Mexico statutes, Chevron's production of natural gas and/or extracted liquids within New Mexico is taxed under four different taxation schemes: the Oil and Gas Severance Tax Act, NMSA 1978, §§ 7–29–1 to –23 (1959, as amended through 2005); the Oil and Gas Conservation Tax Act, NMSA 1978, §§ 7–30–1 to –27 (1959, as amended through 2005); the Oil and Gas Emergency School Tax Act, NMSA 1978, §§ 7–31–1 to –27 (1959, as amended through 2005); and the Oil and Gas Ad Valorem Production Tax Act, NMSA 1978, §§ 7–32–1 to –28 (1959, as amended through 2005). Since the statutory framework of these four acts is substantially the same, they are collectively referred to herein as the "taxes" and collectively cited with reference to the applicable sections of the Oil and Gas Severance Tax Act (Act). *See Blackwood & Nichols Co. v. N.M. Taxation & Revenue Dep't,* 1998–NMCA–113, ¶ 12, 125 N.M. 576, 964 P.2d 137 (stating that these four statutes are to be interpreted as "a consistent statutory scheme").

{7} Severance taxes are imposed on the value of oil and gas at or near the production unit, i.e., at the well or near the well where oil and gas exits the ground. *Feerer v. Amoco Prod. Co.,* 242 F.3d 1259, 1262–63 (10th Cir.2001); *accord Flynn, Welch & Yates, Inc. v. State Tax Comm'n,* 38 N.M. 131, 136, 28 P.2d 889, 892 (1934) (stating that "[t]he tax is tied absolutely to the act or privilege of producing or severing"). Although severance taxes are to be paid on the value of oil and gas at the well or production unit, natural gas is often sold at locations away from

the production unit after the gas has been transported to a processing plant, where liquefiable hydrocarbons are removed from the gas stream. *See Blackwood & Nichols Co.*, 1998–NMCA–113, ¶ 9; *see also Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788, 792 (1995) (discussing the necessity of a pipeline to carry gas from the well to the market, as well as the associated transportation costs). Because costs are incurred in transporting and processing the gas, natural gas producers (like Chevron) are generally allowed to deduct transportation and processing costs from the sales price of the gas when the producers are establishing the value at the production unit on which severance taxes are paid. *See* 3.18.6.9 NMAC (2000) (describing transportation adjustments); 3.18.6.10 NMAC (describing processing adjustments); *Feerer*, 242 F.3d at 1262–63 (observing that New Mexico allows operators to calculate taxable value by deducting costs for compression, dehydration, gathering, and transportation from the sales price).

{8} Chevron's southeastern New Mexico gas production consists primarily of "wet gas," which contains various entrained liquid hydrocarbons, such as propane and butane. *See* 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 1181 (Patrick H. Martin & Bruce M. Kramer eds., 2004). The gas is "processed" at natural gas plants in order to remove the valuable liquid hydrocarbons from the gas stream. *Id.* at 831–832, 1181. Typically, the natural gas liquids (NGLs) that are removed and the "dry" gas stream are sold separately at a price that, after the producer nets out the processing fee, is higher than the price for which the unprocessed gas could be sold. *See id.* at 313.

{9} In 1999, the Department conducted an audit of Chevron's payment of severance taxes for the period beginning November 1, 1995, and ending October 1, 1998. On May 22, 2000, the Department issued an assessment to Chevron for additional taxes, penalties, and interest in the amount of $1,781,690.35 (Assessment). The Assessment was based on the Department's contention that Chevron had claimed excessive processing allowances for gas Chevron had pro-

cessed at the Eunice Plant and the Indian Basin Plant. The Department contended that the processing allowances were excessive because Chevron's processing agreements at those plants were not arm's length and because Chevron maintained an "affiliate" relationship with the plant operators, Dynegy, Inc., (Dynegy) at the Eunice Plant and Marathon Oil Company (Marathon) at the Indian Basin Plant.

{10} Chevron paid the Assessment under protest. Chevron filed a refund application with the Department for the full amount of the Assessment or, alternatively, some lesser amount. *See* NMSA 1978, § 7–1–26(A) (2003) (specifying the requirements for seeking a refund of taxes paid). The Department denied Chevron's refund application. On December 7, 2001, Chevron elected to file a complaint in district court for money owing, instead of proceeding within the agency before a Department hearing officer. *See* § 7–1–26(C)(2) (providing that one of the remedies for denial of a claim for refund is a civil action in district court).

{11} Throughout 2002 and much of 2003, the parties engaged in discovery. Even after the district court appointed a special discovery master to assist with discovery disputes, intense litigation continued over the proper scope of discovery in interrogatories, document production requests, and depositions. In late August 2003, the Department filed two motions for partial summary judgment regarding Chevron's affiliation with the Indian Basin Plant and Chevron's transactions at the Eunice Plant. In response, Chevron filed its own motion for summary judgment, arguing that the Assessment should be dismissed and a refund issued because the Department had failed to compare Chevron's taxable values to others of like quality, character, and use, pursuant to statute. Each of the parties then filed a motion to strike the affidavit of the other's expert.

{12} The district court orally announced its rulings and entered a written order denying Chevron's motion for summary judgment, as well as Chevron's motion to strike the affidavit of the Department's expert. The district court also granted the Department's partial motions for summary judgment and

its motion to strike the affidavit of Chevron's expert. After Chevron moved to dismiss its remaining claims with prejudice, the district court entered final judgment. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

■ {13} Our review of the district court's order granting summary judgment to the Department and denying summary judgment to Chevron is de novo. *Fikes v. Furst*, 2003–NMSC–033, ¶ 11, 134 N.M. 602, 81 P.3d 545. Moreover, legal conclusions and statutory interpretation are questions of law, subject to de novo review. *TPL, Inc. v. N.M. Taxation & Revenue Dep't*, 2003–NMSC–007, ¶ 10, 133 N.M. 447, 64 P.3d 474.

■ {14} Summary judgment is "not generally favored and is to be used only with extreme caution." *Knapp v. Fraternal Order of Eagles*, 106 N.M. 11, 12, 738 P.2d 129, 130 (Ct.App.1987). It "is the appropriate disposition if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fikes*, 2003–NMSC–033, ¶ 11 (internal quotation marks and citation omitted); *see also* Rule 1–056(C) NMRA. In reviewing summary judgment, we look at the whole record in the light most favorable to the nonmoving party. *Pharmaseal Labs., Inc. v. Goffe*, 90 N.M. 753, 758, 568 P.2d 589, 594 (1977); *Reinhart v. Rauscher Pierce Sec. Corp.*, 83 N.M. 194, 196, 490 P.2d 240, 242 (Ct.App. 1971); *see also C & H Constr. & Paving Co. v. Citizens Bank*, 93 N.M. 150, 156, 597 P.2d 1190, 1196 (Ct.App.1979) ("In deciding whether summary judgment is proper, an appellate court must view the matters presented in the light most favorable to support the right to trial on the issues."). Therefore, on appeal, the burden is on the party who won summary judgment to demonstrate the absence of a genuine issue of material fact. *Reinhart*, 83 N.M. at 196, 490 P.2d at 242. "If the evidence is sufficient to create a reasonable doubt as to the existence of a genuine issue, summary judgment cannot be granted." *Poorbaugh v. Mullen*, 96 N.M. 598, 600, 633 P.2d 706, 708 (Ct.App.1981).

### B. Provisions at Issue

{15} At issue in this case are Section 7–29–4.2 and several Department regulations. Section 7–29–4.2 states the following:

> The [D]epartment may determine the value of products severed from a production unit when:
>
> A. the operator and purchaser are affiliated persons;
>
> B. the sale and purchase of products is not an arm's length transaction; or when
>
> C. products are severed and removed from a production unit and a value as defined in the ... Act ... is not established for such products.
>
> The value determined by the [D]epartment shall be commensurate with the actual price received for products of like quality, character and use which are severed in the same field or area. If there are no sales of products of like quality, character and use severed in the same field or area, then the [D]epartment shall establish a reasonable value.

*Id.* Department regulations provide definitions for Section 7–29–4.2(A), (B). Pursuant to Department regulations, "[t]wo persons are affiliated if one of the persons either directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the other person." 3.18.1.7(B)(2) NMAC. The Department may use evidence that a party owns 10 through 50 percent of another company's voting stock to presume that the party directly or indirectly controls and is hence affiliated with that company under Section 7–29–4.2(A) (hereinafter referred to as the "presumption of control"). 3.18.1.7(B)(2) NMAC. Furthermore, "arm's-length" is defined as a "transaction, contract or agreement that has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests regarding that transaction, contract or agreement." 3.18.1.7(B)(1) NMAC. If the operator and the purchaser are affiliated, there can be no arm's length transaction. *Id.* Therefore, the issue of affiliation affects the application of both Section 7–29–4.2(A) and Section 7–29–4.2(B). Be-

cause the issue of affiliation is pivotal in this case, we will address this issue, together with how value should be determined in Section 7–29–4.2, in the context of our review of the parties' motions for summary judgment.

## C. Chevron's Motion for Summary Judgment

### 1. The Department's Presumption of Control Regulation Is Neither Irrational Nor Invalid

■■■■ {16} Chevron argues that the district court erred in not granting Chevron's motion for summary judgment. Chevron does not contest the Department's underlying calculation of its ownership interests in the Eunice Plant and the Indian Basin Plant, which triggered the presumption of control regulation. *See* 3.18.1.7(B)(2) NMAC. Instead, Chevron seeks to have the Department regulation regarding presumption of control declared irrational and hence invalid on its face. Agency regulations that interpret statutes and are promulgated under statutory authority are presumed proper, "[a]nd, of course, it is hornbook law that an interpretation of a statute by the agency charged with its administration is to be given substantial weight." *Regents of the Univ. of N.M. v. Hughes*, 114 N.M. 304, 311–12, 838 P.2d 458, 465–66 (1992). At issue is the Department regulation that states the following:

> (2) Two persons are affiliated if one of the persons either directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the other person. Based on the ownership of the voting securities of a person or based on other forms of ownership:
>
> (a) ownership in excess of fifty percent constitutes control;
>
> (b) ownership of 10 through 50 percent creates a presumption of control; and
>
> (c) ownership of less than ten percent creates a presumption of noncontrol which the department may rebut if it demon-

strates actual or legal control, including the existence of interlocking directorates. 3.18.1.7(B)(2) NMAC.

{17} Chevron relies solely upon *National Mining Ass'n v. United States Department of the Interior*, 177 F.3d 1 (D.C.Cir.1999). There, the Circuit Court of Appeals invalidated an agency regulation that presumed control based on 10 through 50 percent ownership. *Id.* at 5–7. The Circuit Court of Appeals acknowledged that this presumption was rebuttable. *Id.* at 5. The sole basis for invalidating this provision was that the agency had not

> offered any basis to support [the provision's] presumption that an owner of as little as ten per cent of a company's stock controls it. While ten per cent ownership may, under specific circumstances, confer control, [the agency] has cited no authority for the proposition that it is ordinarily likely to do so.

*Id.* at 6–7 (footnote omitted).

{18} We agree with the Department that, contrary to New Mexico law, *National Mining Ass'n* puts the burden on the administrative agency to show that its regulation was proper. *Compare id., with Regents of the Univ. of N.M.*, 114 N.M. at 311–12, 838 P.2d at 465–66 (holding that a regulation promulgated pursuant to statutory authority is "presumed to be a proper implementation of the provisions" of the statute in question). We therefore hold that the reasoning of *National Mining Ass'n* is insufficiently forceful to invalidate 3.18.1.7(B)(2) NMAC. In addition, we are not persuaded that the reasoning, approach, or result in *National Mining Ass'n* is accurate. We refuse to consider its adoption in New Mexico.

### 2. Section 7–29–4.2 Does Not Require a Commensurate Analysis

■■ {19} Chevron asserts that the district court incorrectly held that Chevron had waived its commensurate arguments because it did not raise such arguments in its refund application. We agree with Chevron. After the Department denied Chevron's request for refund, Chevron filed an action for money damages before the district court, rather than instituting a proceeding before a De-

partment hearing officer, pursuant to Section 7–1–26(C)(1). This Court's review encompasses the record developed at the district court level, including discovery and pleadings. Following discovery, during which Chevron obtained information regarding the calculation of processing costs, Chevron raised the issue of the Department's compliance with Section 7–29–4.2. We are thus not persuaded that Chevron was barred from district court or appellate review on this issue. We reverse the district court's order on this matter and consider Chevron's argument.

■ {20} The final paragraph of Section 7–29–4.2 has two sentences. The first sentence specifically requires that when the taxable product value is determined pursuant to the three circumstances listed in Section 7–29–4.2(A)–(C), the set value "shall be commensurate with the actual price received for products of like quality, character and use which are severed in the same field or area." Section 7–29–4.2. The last sentence then provides that the Department may set a reasonable value "[i]f there are no sales of products of like quality, character and use severed in the same field or area." Id. In this case, the Department utilized the actual processing costs that Chevron had reported as part of its federal royalty obligations, rather than Chevron's contractual processing deductions. Chevron contends that the Department's approach does not meet the requirements of Section 7–29–4.2. Chevron would require the Department to compare the taxpayer's processing charges to "the processing fees paid by other operators who processed gas at the Indian Basin and Eunice Plants." We do not agree that Section 7–29–4.2 requires the Department to make such comparisons when it determines the value of a taxpayer's processing fees.

{21} Section 7–29–4.2 states that the final *value,* or end figure as determined by the Department, must be commensurate with the "actual price received for products of like quality, character and use which are severed in the same field or area." *Id.* Section 7–29–4.2 does not mention the commensurate value of processing charges. In fact, this section does not mention processing deductions at all. Neither does this section mention, let alone mandate, a certain methodology for calculating final value. The complete absence of any language in Section 7–29–4.2 regarding methodology, let alone one as specific as commensurate analysis, leads us to hold that Section 7–29–4.2 does not compel the Department to use a particular analysis in arriving at the determination of commensurate value. *Cf. BP Am. Prod. Co. v. Dep't of Revenue,* 2005 WY 60, ¶ 5, 112 P.3d 596 (Wyo.2005) (describing how the "Wyoming Legislature has provided the Department with specific guidance on how it should determine the fair market value of natural gas production . . . that is not sold at or prior to the point of valuation by bona-fide arm[']s-length sale pursuant to one of four methods: 1) comparable sales; 2) comparable value; 3) netback; and 4) proportionate profits" (internal citation omitted)). The question is not "which of various appraisal methods is best or most accurately estimates [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [chosen] method of appraisal." *State Dep't of Revenue v. Amoco Prod. Co.,* 7 P.3d 35, 38 (Wyo.2000) (internal quotation marks and citations omitted). While the Department's methodology is presumed correct, "[o]nce the presumption is successfully overcome, the burden of going forward shifts to the Department to defend its valuation." *BP Am. Prod. Co.,* 2005 WY 60, ¶ 26 (internal quotation marks and citation omitted). Further, Chevron has not raised the question of whether the Department's methodology was correct but only the very narrow question of whether the Department's methodology was impermissible under Section 7–29–4.2.

{22} The Department's methodology emanated from regulations providing that in transactions between affiliated persons, the Department calculates processing costs according to one of two "benchmark[s]." 3.18.6.10(F)-(H) NMAC. Under the benchmark applicable here, where "less than fifty percent of the natural gas processed during the reporting period is processed for non-affiliated persons in arm's-length transactions," the Department makes allowance for actual, allowable processing costs, *see* 3.18.6.10(H) NMAC, as opposed to contractu-

al processing costs, *see* 3.18.6.10(G) NMAC. In this case, the Department used the actual processing costs that Chevron reported as part of its federal royalty obligations.

{23} Chevron asserts that Section 7–29–4.2 "require[s] the Department to ensure that the value upon which it assesses natural gas producers is commensurate with the actual price received for petroleum products of like quality, character and use in the same field or area." Section 7–29–4.2 does not mandate that the Department perform an analysis that compares any particular factor. The meaning of this language lies apart from methodology. Once the Department arrives at a value by applying its regulations, the burden is on the taxpayer to show that the assessment does not comply with Section 7–29–4.2. *See Hawthorne v. Dir. of Revenue Div. Taxation & Revenue Dep't,* 94 N.M. 480, 481, 612 P.2d 710, 711 (Ct.App.1980). This burden is based on the presumption of correctness in the Department's assessments. *See* NMSA 1978, § 7–1–17(C) (1992) ("Any assessment of taxes or demand for payment made by the [D]epartment is presumed to be correct."). If the taxpayer meets its burden of demonstrating that the Department value is not "commensurate with the actual price received for products of like quality, character and use which are severed in the same field or area" under Section 7–29–4.2, then the assessment must be recalculated. *See Regents of N.M. Coll. of Agric. & Mech. Arts v. Acad. of Aviation, Inc.,* 83 N.M. 86, 89, 488 P.2d 343, 346 (1971) (stating that the presumption of correctness may be overcome if the taxpayer shows that the Department failed to comply with the relevant statute). The Department's use of relevant values that Chevron had reported for other purposes was therefore not improper. The taxpayer still has the right to challenge the value but also has the burden of showing noncompliance with the statute. If the taxpayer cannot meet this burden, then the final sentence of Section 7–29–4.2 is triggered, and the Department may simply set a reasonable value on the products. Here, Chevron did not even attempt to show that the Department's value was not commensurate with the actual price received for similar products. We

therefore affirm the district court in this regard.

## D. The Department's Motions for Partial Summary Judgment

### 1. Cooper's Affidavit

■ {24} Chevron argues that the district court should not have struck the affidavit of Chevron's expert, Stephen S. Cooper, because in doing so, the court compromised its decision on the parties' summary judgment motions. Chevron submitted the Cooper affidavit in support of its own motion for summary judgment. In his affidavit, Cooper generally asserted that the terms of Chevron's processing agreements were similar to the terms of the other producers' agreements. Cooper also asserted that Chevron's processing agreement with Marathon at the Indian Basin Plant was "quite favorable to Chevron." These assertions go to whether or not Chevron's processing agreements were arm's length (i.e., that the parties had opposing economic interests) and to support Chevron's position that the Department should have conducted a commensurate analysis to determine value. In the district court, Chevron claimed that Cooper's affidavit only applied to the commensurateness of Chevron's processing fees and that any alleged conflict between Cooper's deposition testimony and his affidavit did not relate to the issue of commensurateness.

{25} On appeal, however, Chevron changes its approach. It no longer argues that the affidavit provides evidence of and creates genuine issues of material fact regarding the method used to determine value. Rather, Chevron seems to be arguing that the contents of the affidavit establish the arm's length nature of Chevron's processing agreements and, accordingly, the absence of any affiliation between Chevron and the plant operators. We disagree with Chevron's recharacterization of the affidavit.

{26} Put another way, the only evidence that could arguably oppose the Department's motions for partial summary judgment is the Cooper affidavit. These motions, however, go to the interpretation of Section 7–29–4.2 as to when the Department can determine

value and how. If the producer and the operator are affiliated, the Department is allowed to determine value. Cooper's affidavit does describe the parties' opposing economic interests and thus supports the arm's length nature of the transactions. However, Cooper's affidavit does not address affiliation. Because Chevron is presumptively an affiliate, and nonaffiliation is required for an arm's length contract, *see* § 7–29–4.2(A), the Cooper affidavit does not overcome the presumption regarding affiliation. As to the method of determining value, Chevron does not argue on appeal that the contents of the affidavit relate to this issue. Thus, we conclude that even if the affidavit had been allowed in, its contents would have been irrelevant to Chevron's argument on appeal that the affidavit rebuts the presumption of affiliation. *See State Farm Mut. Auto. Ins. Co. v. Fennema*, 2005–NMSC–010, ¶¶ 14–15, 137 N.M. 275, 110 P.3d 491 (holding that a legal presumption on which summary judgment was based was not rebutted by the plaintiff's submission of evidence that did not address the presumption). Accordingly, any error in striking the Cooper affidavit would be harmless. *See Cooper v. Curry*, 92 N.M. 417, 420–21, 589 P.2d 201, 204–05 (Ct.App. 1978) (holding that preclusion of irrelevant evidence is not error).

## 2. The Parties' Arguments

{27} As described above, the Department may properly presume, pursuant to its regulations, that Chevron directly or indirectly controlled and is therefore affiliated with both Marathon at the Indian Basin Plant and Dynegy at the Eunice Plant. *See* 3.18.1.7(B)(2) NMAC. Chevron contends that the district court erred in granting summary judgment on the issues of affiliation and arm's length contracts at the Eunice and Indian Basin plants. Chevron does not argue that it owns less than 10 percent at either plant or that the regulatory presumption of control (discussed above) does not apply. Instead, Chevron argues that it re-

butted this presumption with facts sufficient to create a genuine issue of material fact as to its affiliation with the plant operators at the Eunice and Indian Basin plants. We do note that while Chevron has the burden of production on this issue, the Department has the burden to show the nonexistence of a genuine issue of material fact. *See Reinhart*, 83 N.M. at 196, 490 P.2d at 242. In this case, the Department met that burden, and we affirm summary judgment on the issues of nonaffiliation and the absence of arm's length contracts between Dynegy and Chevron at the Eunice Plant and between Marathon and Chevron at the Indian Basin Plant. We explain below.

### a. Eunice Plant

{28} Prior to September 1, 1996, Warren was an operating division of Chevron and sole owner of the Eunice Plant. This was during part of the assessed period. Chevron processed its gas at the Eunice Plant, pursuant to a memorandum of understanding (MOU) with the Warren operating division.

{29} After September 1, 1996, Chevron sold Warren to Natural Gas Clearinghouse (NGC), which immediately became Dynegy. (Both companies are hereinafter referred to as Dynegy). In exchange, Chevron received 28 percent of Dynegy's voting stock.[1] Chevron also had the authority to appoint three of Dynegy's board members. Chevron conceded that at this time, it entered into a long-term strategic alliance wherein Dynegy, through yet another of its subsidiaries, purchased "substantially all" of Chevron's residue gas and NGLs in the United States. Chevron thus listed Dynegy as an "affiliate" in its SEC filings.

{30} At the Eunice Plant, Chevron's gas was processed by Dynegy Midstream Services (DMS), a wholly owned Dynegy subsidiary. Companies other than Chevron had their gas processed at the Eunice Plant. The terms that Chevron had with Warren (i.e., Chevron itself) under the MOU re-

---

1. In other portions of the record, Chevron asserted that it owned 25.91 percent of Dynegy's voting stock and that Chevron held an equity interest of approximately 29 percent. Since Chevron does not dispute that its ownership interests bring it within the 10 through 50 percent range for the presumption of control, this minor discrepancy is without effect in this case. *See* 3.18.1.7(B)(2) NMAC.

mained the same when Dynegy took over. Chevron did not have the option under the terms of the MOU to process Chevron's gas anywhere else. Another company, Versado Gas Processors (Versado), took over these processing obligations at some point. Dynegy owned 63 percent of Versado. It was created via a Dynegy and Texaco deal, which brought the two companies' assets under one "umbrella." Versado kept as its processing fee 25 percent of Chevron's residue gas and NGLs processed at the Eunice Plant. Chevron was required to sell the remaining 75 percent of these products to Dynegy.

### b. Indian Basin Plant

{31} The Dynegy–Chevron relationship is also extant at the Indian Basin Plant, in which Chevron had a 14 percent ownership interest prior to September 1, 1996. After this date, Chevron sold not only Warren and the Eunice Plant to Dynegy but also this 14 percent interest in the Indian Basin Plant. Again, Chevron retained 28 percent of Dynegy's stock.

{32} Marathon owned the largest interest and served as the operator at the Indian Basin Plant. In negotiating with Chevron, Marathon was acting on its own behalf and on behalf of the Indian Basin Plant owners (including Chevron). Under a tiered agreement, Marathon retained 75 percent of the NGLs produced in a day. When the month's average was more than 25 mmcf[2] NGLs produced per day, Marathon would retain a lower percentage of the NGLs. Chevron retained all of its residue gas under this agreement.

### c. Discussion

■ {33} The question is whether, as a matter of law, Chevron is affiliated with Dynegy at the Eunice Plant and with Marathon at the Indian Basin Plant. Department regulations create a rebuttable presumption that Chevron was affiliated with the operators of the Indian Basin and Eunice plants, due to Chevron's ownership interests in those plants. See 3.18.1.7(B)(2) NMAC. Because nonaffiliation is also required for a processing agreement to be arm's length, we only

address affiliation. See § 7–29–4.2(A), (B); 3.18.1.7(B)(1) NMAC (stating that an arm's length transaction is one between "nonaffiliated persons").

{34} In favor of its motions for summary judgment, the Department submitted an affidavit from Roger Riddlehoover. He asserted that when a producer (like Chevron) uses an affiliated company to provide services or purchase production, this "circumstance warrants special treatment because of the potential that intra-company transfers may mask, or bias, the true economic value of the resource in such a way as to reduce payments to ill-informed passive claimants" (like the Department). In analyzing Chevron's production at the Eunice Plant, Riddlehoover agreed that the terms of the 1996 processing agreement between Chevron and Dynegy were more favorable to Dynegy. He asserted that despite this fact, these less favorable terms did not necessarily harm Chevron because giving more to Dynegy was part of the consideration for the sale of Warren and the Eunice Plant to Dynegy.

{35} As far as the Indian Basin Plant was concerned, Riddlehoover noted that the Plant was actually built by a group of producers, which included Chevron and Marathon. The largest producer, Marathon, was appointed operator. He concluded that the terms between Marathon as plant operator and the plant owners were not meaningfully negotiated. Because Chevron was on both sides of the transaction (as a producer and as a part owner of the plant that was processing Chevron's products), what Chevron paid for processing did not have much meaning.

{36} Through the presumption of control (based on 10 through 50 percent ownership interests) and the other evidence of Chevron's relationships at the Indian Basin and Eunice plants, the Department met its burden of demonstrating that there is no genuine issue of material fact as to Chevron's affiliation with Marathon and Dynegy. Relying on its legal theory that the Department's regulation was irrational and invalid, Chevron provided no evidence to rebut the presumption of affiliation. In addition, Chev-

---

**2.** One million cubic feet. 8 Williams & Meyers, *supra,* at 632.

**508**

ron's assertions that the Department was biased and pre-judged the affiliation issue in an arbitrary and capricious fashion are equally without merit. To the extent that this argument is based upon testimony from a Department witness that it is impossible for a company like Chevron, which is both a producer and a plant owner, to have an arm's length contract, we again point out that Chevron is presumptively an affiliate and that nonaffiliation is required for an arm's length contract. *See id.* Further, to the extent that Chevron seeks by its arguments to create a genuine issue of material fact, the "arguments of counsel are not evidence." *In re Application of Metro. Invs., Inc.,* 110 N.M. 436, 441, 796 P.2d 1132, 1137 (Ct.App.1990). We therefore affirm the district court's grant of summary judgment to the Department on this issue and the court's denial of Chevron's motion for summary judgment.

### III. CONCLUSION

{37} In this case, we hold that Chevron has not shown a sufficient basis for invalidating the Department's regulation that presumes control based on 10 through 50 percent ownership; therefore, we also hold that the presumption of control applies in this case. *See* 3.18.1.7(B)(2) NMAC. Further, we hold that Section 7–29–4.2 requires that the value of natural gas assessed by the Department must be commensurate with "the actual price received for products of like quality, character and use which are severed in the same field or area" and that the burden is on the taxpayer to demonstrate that the Department's assessment does not conform to this requirement. Also in this context, while Section 7–29–4.2 requires that the value be commensurate, we hold that this statute does not mandate a particular analysis the Department must use in order to arrive at that value. We therefore affirm the district court on this point. Finally, we hold that there is no genuine issue of material fact as to Chevron's affiliation with the operators at issue, and we therefore affirm the district court's grant of summary judgment to the Department and the denial of Chevron's motion for summary judgment on this issue. The affidavit of Chevron's expert, even if improperly

struck, was insufficient to create an issue on this point.

{38} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and CYNTHIA A. FRY, Judge.