**Certiorari Denied, No. 31,424, January 20, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-019**

**Filing Date: October 30, 2008**

**Docket No. 27,734**

**KINDER MORGAN CO2 COMPANY, L.P.,**

      **Plaintiff-Appellee,**

**v.**

**STATE OF NEW MEXICO TAXATION
AND REVENUE DEPARTMENT,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Carol J. Vigil and Daniel A. Sanchez, District Judges**

Hinkle, Hensley, Shanor & Martin, L.L.P.
Andrew J. Cloutier
Joel M. Carson, III
Roswell, NM

for Appellee

Gary K. King, Attorney General
Carolyn A. Wolf, Special Assistant Attorney General
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Chief Judge.**

**{1}** In this appeal involving severance taxes, we address the concept of excusable neglect in a Rule 1-060(B)(1) NMRA proceeding where an attorney is careless in failing to meet a deadline. We are also required to interpret a regulation of the New Mexico Taxation and Revenue Department (the Department) that allows a purchaser of an interest in a pipeline to

deduct transportation costs from the price of the product sold. We hold that the district court did not abuse its discretion in finding excusable neglect under the circumstances. We also hold that the district court erred in its interpretation of the regulation and in determining that the taxpayer was entitled to a refund of severance taxes assessed and paid.

**BACKGROUND**

**{2}** The Bravo Dome Pipeline (the pipeline) was constructed prior to 1985 to transport compressed carbon dioxide from the production unit to the oil fields where it is injected into reservoirs to enhance oil production. Sun Oil Company (Sun), one of several original constructors of the pipeline, made a capital investment of approximately $7.9 million in the construction of the pipeline.

**{3}** In 1991 the Department adopted regulations allowing taxpayers to deduct the cost of transportation from the price of products sold away from the production unit. The regulation at issue states, in part:

> [a]llowable transportation costs are . . . depreciation expense, which includes depreciation on the pipeline or gathering system and associated equipment determined on the straight-line method based on the class life of the pipeline or gathering system and equipment and an appropriate salvage value for equipment. A successor in business or purchaser of assets shall base depreciation expense for the purposes of Section 3.18.6.9 NMAC upon the depreciation schedules of the previous owner[.]

3 NMAC 18.6.9(H)(4) (1991, as amended through 2000). Prior to the adoption of this regulation, the only transportation deduction allowed was the "reasonable expense of trucking the product from the production unit to the first place of market."

**{4}** In 1985 Shell Oil Company or a related entity (Shell) bought Sun's 13 percent interest in the pipeline for $45 million, and Shell claimed transportation deductions that included depreciation of its $45 million interest in the pipeline. When Kinder Morgan $CO_2$ Company, L.P. (Kinder Morgan) purchased Shell's interest in 1998, it based its depreciation expense on Shell's depreciation schedule.

**{5}** In September 2001, the Department issued an assessment claiming that Kinder Morgan owed $838,935.60 in underpaid taxes, interest, and penalties covering the period November 1996 through June 2000. The Department claimed that Regulation 3.18.6.9(H)(4) required depreciation to be calculated on the basis of the initial $7.9 million capital outlay by Sun, instead of on the basis of Shell's $45 million purchase price.

**{6}** Kinder Morgan paid the entire amount of the assessment and then filed a claim for refund in the district court pursuant to NMSA 1978, Section 7-1-26(C)(2) (2001) (amended 2003). In September 2003, the district court granted partial summary judgment in favor of

2

Kinder Morgan on the issue of liability, which required the Department to refund all monies paid by Kinder Morgan on the depreciation portion of the Department's assessment.

**{7}**     The issue of the amount of refund to be awarded remained for trial.  The parties entered into settlement negotiations.  In May 2005, the court issued an order vacating all deadlines after the attorney for Kinder Morgan informed the court that a settlement had been reached "in principle."  After a judge reassignment, the court, in April 2006, conducted an administrative review of pending cases and issued an order under Rule 1-041(E)(2) NMRA dismissing the case without prejudice for lack of prosecution with reinstatement for good cause if shown in a motion filed within thirty days.  Kinder Morgan's counsel received notice of this thirty-day Rule 1-041(E)(2) deadline but failed to enter a reminder in the firm's calendaring system.  Having missed the deadline for reinstatement, Kinder Morgan filed a Rule 1-060(B)(1) motion for relief in July 2006, asking the district court to vacate the dismissal on the basis of attorney excusable neglect, relying on *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993), which defines "excusable neglect."  In October 2006, the court granted this motion and reinstated Kinder Morgan's claim.  Kinder Morgan thereafter obtained a judgment in its favor for the full refund plus interest, from which the Department appealed.

**DISCUSSION**

**{8}**     On appeal, the Department asserts that (1) the district court abused its discretion under Rule 1-060(B)(1) when it vacated its Rule 1-041(E)(2) dismissal for failure to prosecute, and (2) the district court erred in granting summary judgment to Kinder Morgan on the issue of tax liability.  The first issue turns on the legal definition of "excusable neglect" and whether we adopt the standard set forth in *Pioneer*.  We adopt the *Pioneer* standard and conclude that the circumstances of this case are appropriate for granting Kinder Morgan relief despite its admitted failure to make a motion to reinstate within the thirty-day deadline required by Rule 1-041(E)(2).  The second issue requires us to determine whether Regulation 3.18.6.9(H)(4) required Kinder Morgan to use Sun's original construction cost in calculating pipeline depreciation or instead use Shell's depreciation schedule because Shell was Kinder Morgan's immediate predecessor in ownership.  We conclude that the district court erred in its interpretation and application of the regulation favoring Kinder Morgan.  We discuss the circumstances giving rise to the foregoing issues in more detail later in this opinion.

**I.     Excusable Neglect Under Rule 1-060(B)(1)**

**A.     Standard of Review**

**{9}**     "We generally review the district court's grant of relief under Rule 1-060(B) for an abuse of discretion except in those instances where the issue is one of pure law[.]" *Martinez v. Friede*, 2004-NMSC-006, ¶ 19, 135 N.M. 171, 86 P.3d 596 (citation omitted), *superseded on other grounds by Rule 1-059 NMRA as stated in State v. Moreland*, 2008-NMSC-031,

¶ 11, 144 N.M. 192, 185 P.3d 363; *see also Meiboom v. Watson*, 2000-NMSC-004, ¶ 29, 128 N.M. 536, 994 P.2d 1154 (addressing Rule 1-060(B)(6)); *Edens v. Edens*, 2005-NMCA-033, ¶¶ 13-14, 137 N.M. 207, 109 P.3d 295 (addressing Rule 1-060(B)(1), (3), (5), and (6)). The scope of Rule 1-060(B)(1) and application of the rule to the facts involve questions of law which we review de novo. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 ("[E]ven when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo." (internal quotation marks and citation omitted)). We review the district court's decision as to whether neglect was excusable for abuse of discretion.

> An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason. When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion.

*Moreland*, 2008-NMSC-031, ¶ 9 (internal quotation marks and citations omitted). To reverse the district court under an abuse-of-discretion standard, we must determine that the court's decision as to excusable neglect under Rule 1-060(B)(1) was "arbitrary, fanciful, or unreasonable." *Meiboom*, 2000-NMSC-004, ¶ 29 (internal quotation marks and citation omitted).

## B.    Definition of Excusable Neglect

{10}    In general, proper application of Rule 1-060(B) requires courts to balance interests of finality versus relief from unjust judgments. *See Phelps Dodge Corp. v. Guerra*, 92 N.M. 47, 50, 582 P.2d 819, 822 (1978). We currently have no explicit guidance in New Mexico decisions on what constitutes "excusable neglect" for purposes of granting relief under Rule 1-060(B)(1). *See Rodriguez v. Conant*, 105 N.M. 746, 747, 750, 737 P.2d 527, 528, 531 (1987) (mentioning, but not reaching, the issue of whether "mere carelessness" is excusable neglect under Rule 1-060(B)(1)); *Capco Acquisub, Inc. v. Greka Energy Corp.*, 2007-NMCA-011, ¶ 27, 140 N.M. 920, 149 P.3d 1017 (applying excusable neglect to Rule 12-201(E)(2) NMRA, and stating that "there are few New Mexico cases elaborating on the concept of excusable neglect"); *Adams v. Para-Chem Southern, Inc.*, 1998-NMCA-161, ¶ 8, 126 N.M. 189, 967 P.2d 864 (addressing "'admittedly inexcusable conduct'" under Rule 1-060(B)(1)). In *Rodriguez*, our Supreme Court overruled an unpublished decision of this Court which held that "mere carelessness did not constitute excusable neglect under Rule 1-060(B)(1)." *Rodriguez*, 105 N.M. at 750, 737 P.2d at 531 (internal quotation marks omitted). However, the Supreme Court in *Rodriguez* did not address whether that holding was correct because it decided the case under Rule 1-060(B)(6) instead. *Rodriguez*, 105 N.M. at 750, 737 P.2d at 531. Nonetheless, the Court noted that under Rule 1-060(B)(1) it is for the district court, in the first instance, "to determine what is a good excuse, and that the district court should be liberal in that determination." *Rodriguez*, 105 N.M. at 750, 737

4

P.2d at 531.

**{11}** The New Mexico Rules of Civil Procedure are modeled after the Federal Rules of Civil Procedure, and the substance of Rule 1-060(B) is virtually identical to its federal counterpart, Federal Rule of Civil Procedure 60(b). *See Cordova v. Larsen*, 2004-NMCA-087, ¶ 6, 136 N.M. 87, 94 P.3d 830 (clarifying the exception "that [Rule 1-060(B)] omits the passage concerning the United States Code"). Rule 60(b)(1) provides, in relevant part, that "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect[.]" Because our rule closely tracks this language, the federal construction of Rule 60(b) is persuasive authority for the construction of Rule 1-060(B). *See Albuquerque Redi-Mix, Inc. v. Scottsdale Ins. Co.*, 2007-NMSC-051, ¶ 9, 142 N.M. 527, 168 P.3d 99.

**{12}** Prior to 1993 there was a split among the federal circuit courts as to whether attorney negligence could ever be excusable under the excusable neglect standard in Rule 60(b)(1). *Robb v. Norfolk & Western Ry. Co.*, 122 F.3d 354, 358 (7th Cir. 1997). In 1993, in *Pioneer*, the United States Supreme Court defined "excusable neglect" in the context of Federal Rule of Bankruptcy Rule 9006(b)(1), which is similar to Rule 60(b)(1). *Pioneer*, 507 U.S. at 394-95. In *Pioneer*, the client and attorney failed to file proofs of claim before the "bar date" due to negligent omission on their part. *Id.* at 383-84, 394-95, 398. The bankruptcy court held that the mistake could not constitute "excusable neglect" and that "a party may claim excusable neglect only if its failure to timely perform a duty was due to circumstances which were beyond its reasonable control." *Id.* at 384 (alterations omitted) (internal quotation marks and citation omitted). The United States Supreme Court disagreed and stated that "[t]he ordinary meaning of neglect is to give little attention or respect to a matter, or, closer to the point for our purposes, to leave undone or unattended to especially through carelessness." *Id.* at 388 (alteration omitted) (emphasis omitted) (internal quotation marks and citation omitted). Likening Rule 9006(b)(1) to Rule 60(b)(1), the Court in *Pioneer* concluded that, based on the plain meaning of the word "neglect," relief is allowable in situations involving attorney negligence rather than situations where a party's failure is solely due to circumstances beyond their control. *Id.* at 392-94. The Court also provided a multi-factor balancing test to be applied when determining if any neglect is excusable.

> [T]he determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395 (footnote omitted). The Court's determination that the test is based in equity is consistent with our case law. *See Phelps Dodge Corp.*, 92 N.M. at 50, 582 P.2d at 822 (stating that courts should liberally construe Rule 60(b)(1) in favor of relief although the

courts "must consider whether there are any intervening equities that make it inequitable to grant relief"); *cf. Martinez*, 2004-NMSC-006, ¶ 15 (discussing a district court's "reservoir of equitable power" under Rule1-060(B)(6)). Multiple circuit courts have applied the *Pioneer* definition of "excusable neglect" in the context of Rule 60(b). *See Robb*, 122 F.3d at 361-62 (collecting cases).

**{13}** We believe the Supreme Court correctly defined "excusable neglect," and thus, we adopt this definition as the standard for relief under Rule 1-060(B)(1). In applying the standard, the district court should consider all relevant circumstances related to a party's neglect. *Pioneer*, 507 U.S. at 395. In New Mexico, we recognize that the district court's intimate familiarity with such circumstances puts it in a better position than an appellate court to determine whether a party truly failed to actively pursue a claim. *See Martinez*, 2004-NMSC-006, ¶¶ 22, 24 (indicating that the district court judge could act under Rule 1-060(B)(6) to grant a new trial on the basis of juror confusion, in that the judge was best situated to assess the circumstances); *Meiboom*, 2000-NMSC-004, ¶ 29 (stating that a reviewing court "cannot merely substitute its judgment for that of the trial court unless there has been a clear abuse of discretion").

**{14}** To be clear, *Pioneer* does not require or even encourage district courts to permit late filings or set aside orders or judgments just because Rule 60(b)(1) relief is requested based on excusable neglect. Instead, the use of the word "may" in the text of Rules 60(b) and 1-060(B) empowers the court with the discretion, in the rare occasions when appropriate, to grant relief from its own judgments and orders. *See Pioneer*, 507 U.S. at 388 (stating that courts are "permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness"). We echo the Supreme Court's warning in *Pioneer* that "were there any evidence of prejudice to petitioner or to judicial administration in this case, or any indication at all of bad faith," we may determine that the district court abused its discretion in finding the neglect to be "excusable" and granting relief. *Id.* at 398.

## C. Application of Rule 1-060(B)(1)

**{15}** We disagree with the Department's view that the district court abused its discretion in vacating the Rule 1-041(E)(2) dismissal. The court's application of Rule 1-060(B)(1) to vacate its own administrative dismissal is consistent with the *Pioneer* standard. Specifically, the lack of prejudice to the Department, the lack of significant delay, the lack of impact on judicial proceedings, and the absence of evidence of any ulterior motives of bad faith support the finding by the district court that the neglect of Kinder Morgan's counsel was excusable. We turn to these *Pioneer* factors.

### 1. Danger of Prejudice to the Department

**{16}** The first factor set forth in *Pioneer* is the danger of prejudice to the party opposing the relief. 507 U.S. at 395. The Department does not argue that it was prejudiced by the district court's act of setting aside its Rule 1-041(E)(2) dismissal. Furthermore, we see no

prejudice. The interest of maintaining finality was not undermined by granting Rule 1-060(B)(1) relief. The district court had already granted summary judgment in favor of Kinder Morgan on the issue of liability, and scheduling deadlines had been vacated in the interest of consummating settlement negotiations as to the refund amount. Only the amount of refund was left to be determined. This factor does not weigh against granting Rule 1-060(B)(1) relief.

## 2. Length of Delay and Its Potential Impact on Judicial Proceedings

**{17}** The next *Pioneer* factor is the length of the delay and its potential impact on judicial proceedings. 507 U.S. at 395. The Department's argument under this factor focuses on whether Kinder Morgan made its motion for Rule 1-060(B)(1) relief within a reasonable time, but the Department offers no indication of how the consequence of missing the Rule 1-041(E)(2) deadline had any negative impact on judicial proceedings. We fail to see how Kinder Morgan's two-month-late request for relief from dismissal had any adverse impact on the judicial proceedings; thus it does not weigh against granting relief. *See Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996) (concluding that it saw "no adverse impact on the district court or its resources" in allowing relief under Rule 60(b)(1)).

## 3. Reason for Delay

**{18}** *Pioneer* also lists the reason for the delay as a factor in determining whether neglect is excusable. 507 U.S. at 395. The Department is correct in pointing out that "[c]arelessness by a litigant or his counsel does not afford a basis for relief under Rule 60(b)(1)," quoting *Pelican Production Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990). Rule 60(b)(1) does not condone careless or negligent attorney conduct by granting relief *because of* or *based on* acts of carelessness. Instead, Rule 60(b)(1) serves as a narrow exception empowering a court with the discretion to grant relief despite an attorney's carelessness. *See Pioneer*, 507 U.S. at 388 ("[T]he [r]ule grants a reprieve to out-of-time filings that were delayed by 'neglect.'"). *Pioneer* specifically recognized that any per se rules automatically precluding relief due to a showing of fault would be inconsistent with "the language of the [r]ule or the evident purposes underlying it." *Id.* While the Department cites cases which followed a rule that attorney carelessness could not be excusable neglect, the cases the Department cites in support of its argument were decided prior to *Pioneer* and are examples of the narrow approach rejected by *Pioneer. See Pelican Prod. Corp.*, 893 F.2d at 1146; *Picucci v. Town of Kittery*, 101 F.R.D. 767, 768 (D.C. Me. 1984).

**{19}** Although we do not condone the reason for missing the Rule 1-041(E)(2) deadline for reinstatement—failure to input the deadline in the firm's computerized calendaring system—this carelessness is not considered in isolation. In fact, the Seventh Circuit Court of Appeals has expressly held that a trial judge may even consider his or her long-term experience with an attorney and whether the attorney in question has a history of consistently meeting deadlines, missing deadlines, or adhering to other procedural requirements. *See*

7

*Robb*, 122 F.3d at 362 ("We hold that so long as the trial judge does not treat [the attorney's] overall record of compliance with court deadlines as a dispositive factor, he may consider this record as one of the facts and circumstances that has a bearing on whether the negligence of [the attorney] constitutes 'excusable neglect.'" (emphasis omitted)). While we recognize that such flexibility is a tool worth giving the district court, we also recognize that Rule 1-060(B)(1) is not intended to condone or encourage lapses in professional obligations. *Cf. Phelps Dodge Corp.*, 92 N.M. at 50, 582 P.2d at 822 ("The intendment of Rule 60(b) is to carefully balance the competing principles of finality and relief from unjust judgments."). There may be very few professional negligence circumstances that warrant Rule 1-060(B)(1) relief. And we recognize that the reason for the delay in this case weighs against granting relief to Kinder Morgan because Kinder Morgan missed its deadline due to negligence, but this consideration is to be balanced against the other factors set out in *Pioneer*.

### 4.     Whether the Movant Acted in Good Faith

{20}     Finally, *Pioneer* states that a court should consider whether the movant acted in good faith. 507 U.S. at 395. The Department has offered no evidence nor made any argument that Kinder Morgan acted in bad faith. It is undisputed that Kinder Morgan's counsel's failure to meet the deadline was due to inadvertence rather than, for example, the result of a deliberate litigation strategy that failed or deliberate disobedience of a court order. Further, this is not a case where a party repeatedly disregarded procedural obligations. Thus, this factor weighs in favor of granting relief.

### 5.     Weighing the Factors

{21}     While the reason for the delay in this case was carelessness, which weighs against allowing relief, the rest of the factors weigh in favor of granting relief. Despite the admitted carelessness of Kinder Morgan's attorney, there was no prejudice to the Department, nor was there a significant negative impact on the proceedings given that Kinder Morgan had already obtained a judgment against the Department on the issue of liability, and the parties appear to have been engaged over the following lengthy period in off-and-on settlement negotiations. We also fail to see how the two-month spillover after the court's deadline delayed the parties and court to any noteworthy degree from reaching a final disposition of the matter. Finally, there is no indication that Kinder Morgan did not act in good faith. In our view, the circumstances weigh heavily in favor of granting relief, and thus we cannot conclude that the district court abused its discretion in granting relief from the dismissal under Rule 1-060(B)(1) in this case.

{22}     This result is in line with the outcome in *Pioneer* as well as similar cases applying *Pioneer*. *See Pioneer*, 507 U.S. at 380, 397 (concluding that an attorney's oversight in missing a deadline was excusable); *Cheney*, 71 F.3d at 848-50 (holding that the movant demonstrated excusable neglect where the delay was based on a negligent miscommunication between the lead counsel and an associate, the delay was slight, there

was no prejudice to the opposing party, and no negative impact on the judicial proceedings); *Inf. Sys. & Networks Corp. v. United States*, 994 F.2d 792, 794, 797 (Fed. Cir. 1993) (concluding that there was excusable neglect under Rule 60(b)(1) where the delay was based on a misunderstanding by the attorney).

**{23}**    Whether Rule 1-060(B)(1) relief should be granted in any case is to be decided on a case-by-case basis, and the outcome is fact dependent. Our holding in this case that the district court did not abuse its discretion is in no way to be considered an open door excusing attorney neglect. Owing mostly to the existence of a judgment on liability and the lack of prejudice to either process or parties, the circumstances here were sufficiently compelling for relief from the dismissal to support the discretion exercised by the district court. We expect the circumstances in which this ruling applies to be rare.

## II.    Summary Judgment

**{24}**    Summary judgment is appropriate where, as here, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Our review on a grant of summary judgment is de novo. *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 8, 139 N.M. 12, 127 P.3d 548. All reasonable inferences from the record are construed in favor of the non-moving party. *Celaya v. Hall*, 2004-NMSC-005, ¶ 7, 135 N.M. 115, 85 P.3d 239. Further, construction of a regulation presents a question of law requiring de novo review. *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, 2007-NMCA-157, ¶ 18, 143 N.M. 133, 173 P.3d 55.

**{25}**    In interpreting a regulation, we apply the same rules as used in statutory interpretation. *Id*. Our central concern is to determine and give effect to the intent of the promulgating body with the language used being the primary indication of intent. *State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). We will not read into a statute or regulation language that is not there, particularly if it makes sense as written. *Burroughs v. Bd. of County Comm'rs*, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975).

## A.    Background

**{26}**    Taxable value relating to oil and gas severance taxation is governed by the price of the product at the production unit. *See* NMSA 1978, § 7-29-2(D) (1987, as amended through 2005). When the product began to be sold at locations distant from the production unit, considerations of deduction in price for transportation expense entered the taxation picture. *See Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1251 (D.C. Cir. 1996) (discussing changes in the natural gas industry, including deregulation of wellhead gas prices); *Chevron U.S.A. v. State ex rel. Dep't of Taxation & Revenue*, 2006-NMCA-050, ¶ 7, 139 N.M. 498, 134 P.3d 785 (discussing severance tax-related allowances for the deduction of processing expense from the price at the production unit); *Blackwood & Nichols Co. v. N.M. Taxation & Revenue Dep't*, 1998-NMCA-113, ¶¶ 8-9, 125 N.M. 576,

9

964 P.2d 137 (discussing the change in New Mexico from sale of natural gas at the wellhead to sale downstream from the wellhead). The issue at hand pertains to allowance of a deduction from the price for transportation expense when the product is sold at a place other than at the production unit.

**{27}** Regulation 3.18.6.9, adopted in 1991, deals in part with a deduction called a "transportation adjustment." 3.18.6.9(A) NMAC. The transportation adjustment covers cost of transportation from a production unit to the point at which the product is sold. *See id.* We refer to Regulation 3.18.6.9 generally as "the regulation." The regulation provides the method for establishing the transportation adjustment.

**{28}** Subsection (H)(4) of the regulation, which we refer to as "the subsection," states that allowable transportation costs include "depreciation expense." 3.18.6.9(H)(4) NMAC. The transportation adjustment is to be based on "depreciation on the pipeline or gathering system and associated equipment determined on the straight-line method based on the class life of the pipeline or gathering system and equipment and an appropriate salvage value for equipment." *Id.* Particularly important in the present case, the subsection also states, "A successor in business or purchaser of assets shall base depreciation expense for the purposes of Section 3.18.6.9 NMAC upon the depreciation schedules of the previous owner[.]"

**{29}** About seven years before 1991, in 1983 or 1984, the pipeline was constructed by a consortium of companies, one of which was Sun. Sun invested $7.9 million. In 1985 Shell purchased Sun's assets, designating $45 million out of a considerably larger asset purchase price of about $675 million as the amount paid for Sun's interest in the pipeline. When 1991 rolled around, Shell apparently figured its transportation adjustment under the regulation using a depreciation schedule it had earlier established based on its $45 million investment. Kinder Morgan partnered with Shell in 1998 and ultimately purchased Shell's interest in the pipeline in 2000. Kinder Morgan proceeded to figure its transportation adjustment either using Shell's depreciation schedule or based on Shell's $45 million purchase price.

## B.    Proceedings in the District Court

**{30}** On cross-motions for summary judgment, Kinder Morgan contended that the regulation illegally impaired a vested right of Shell, a right derived in 1985 from Shell's "power to establish a depreciation schedule based on its acquisition cost . . . and to build that depreciation expense into its tariff." The impairment according to Kinder Morgan was a result of the Department's "attempt to restate Shell's 1985 depreciation schedule." In this regard, Kinder Morgan argued that the regulation, as applied in the Department's assessment, was impermissibly retroactive in that it altered and restricted Shell's right to depreciate its pipeline asset acquired in 1985. In support of its retroactivity argument, Kinder Morgan cited the common law presumption against retroactivity and NMSA 1978, Section 9-11-6.2(H) (1995), which states that if an administrative regulation of the Department does not state it has retroactive effect the regulation will be applied prospectively only.

**{31}**     Kinder Morgan further contended that the regulation, as applied, violated the United States and New Mexico constitutional prohibitions against impairment of contracts, arguing impairment of the $45 million investment that Shell had made based on its purchase and "knowing that it could recover its investment through depreciation and a tariff that incorporated its depreciation expense." *See* U.S. Const. art. I, § 10, cl. 1; N.M. Const. art. II, § 19. Thus, Kinder Morgan argued that the regulation could not affect Shell's right in 1991 and afterwards to use a depreciation schedule based on its $45 million investment.

**{32}**     In reply to arguments of the Department as to the meaning of the subsection, Kinder Morgan argued that the plain language of the subsection favored Kinder Morgan, in that Shell, not Sun, was Kinder Morgan's predecessor. And Kinder Morgan asserted that the Department's interpretation, which was that the subsection required all pipeline owners at the time of the adoption of the regulation to use their predecessor's depreciation schedule, "flies in the face of commercial realities and practices," "nullifying for purposes of calculating depreciation, any bonafide arm's-length transaction in which a purchaser established a cost basis higher than the basis utilized by its predecessor prior to 1991."

**{33}**     In response, the Department explained that historically it had followed a "conservative methodology" pursuant to which the Department allowed pipeline owners to deduct depreciation of processing facilities from the tailgate price based on a straight line depreciation over thirty years. The Department indicated that this "conservatism" was followed when the practice was formalized in the regulation in 1991, requiring the "use [of] a straight line depreciation . . . over the life of the asset with an appropriate salvage value." Thus, according to the Department, the same pre-1991 policy of conservatism was continued in the regulation. To permit an owner to ignore the subsection would allow the owner in 1991 to establish a depreciation schedule inconsistent with the Department's historical straight line thirty-year depreciation methodology and inconsistent with the Department's intent to continue that approach in the subsection. Leading up to 1991, the Department states, the practice was that the owner would "sit down with the Department and argue about depreciation rates," and the regulation "was enacted with the idea that everybody had a departmentally[]approved depreciation rate."

**{34}**     The Department countered Kinder Morgan's impairment arguments by arguing that Kinder Morgan's interpretation of the subsection was "unfounded," in that "it cuts against the practice of the commission of conservatism in this case" and is "fundamentally inconsistent[] with the . . . part of the rule, which continues this practice of conservatism." The Department further argued that if Kinder Morgan's view was accepted, the subsection gave Kinder Morgan an unchallengeable property right to use a "600 percent inflated depreciation rate going forward" and that this was "not a plausible interpretation" of the subsection. According to the Department, the transition from the pre-1991 practice of the owner and the Department getting together to set the depreciation rate to the requirement set out in the subsection "was never meant to be . . . a free pass for whatever intermediate rate that [the seller and purchaser] imposed on each other." According to the Department, it was rational and more plausible that "[t]he rule was meant to discourage both accounting

11

machinations and monopoly exploitation of, or by, the taxpayer, by requiring use of the predecessor's depreciation schedule at the time of the adoption of the rule in 1991."

**{35}** In entering partial summary judgment in favor of Kinder Morgan, the district court noted but rejected the Department's argument that "the intent of the regulation was to prohibit what occurred in this case and that this court should require [Kinder Morgan] to use . . . Sun's  depreciation schedule based on $7.9 million."  The court agreed with Kinder Morgan "that at the time [it] purchased the pipeline from [S]hell the regulation directed them to use the previous owner[']s depreciation schedule."  The court further stated, "[i]n the seven years after the regulation was in place no action was taken to enforce [the regulation] against Shell and thus [Kinder Morgan] has a right to rely on the regulation and use Shell's depreciation schedule."  The court did not state that its ruling was based on theories of impairment or retroactivity.

## C.     This Appeal

**{36}** In its brief in chief on appeal, the Department attacks only the court's "estoppel-type finding" and Kinder Morgan's impairment and retroactivity arguments in asserting error and ignores any issue as to the meaning of the regulation or subsection.  In its answer brief, Kinder Morgan points out that the Department failed to "confront the primary basis for the [district] court's ruling" and states that the only issue this Court needs to address on appeal is whether the district court's ruling was "consistent with a straight-forward, textual interpretation of the Department's operative regulation."  Kinder Morgan then primarily focuses on "the plain language of the operative regulation."  As an alternative argument, Kinder Morgan argues its theory of impermissible retroactive application.  Kinder Morgan does not raise the vested right and contract impairment theories it argued in the district court, nor does it argue in support of the court's estoppel-based ruling.  In its reply brief, the Department indicates that the regulation was a purposeful limitation of "the manipulation of deductions resulting from transactions between affiliated companies" and was to assure that "the depreciation base could not be increased by successive sales of the facilities." *See* Rule 12-213(C) NMRA (permitting an appellant to address in its reply brief arguments asserted only in the appellee's answer brief). *Compare Brashear v. Packers*, 118 N.M. 581, 582-83, 883 P.2d 1278, 1279-80 (1994) (permitting an appellant to address in a reply brief an argument clearly and well raised in the answer brief), *with Hale v. Basin Motor Co.*, 110 N.M. 314, 321, 795 P.2d 1006, 1013 (1990) (declining to address appellant's new reply brief argument contesting charges contained in an attorney fee award, where the appellees pointed out in their answer brief the mistaken position taken in appellant's brief in chief that it was the cost award that contained the contested charges), *and Doe v. City of Albuquerque*, 96 N.M. 433, 436, 631 P.2d 728, 731 (Ct. App. 1981) (declining to address an issue argued in the appellant's reply brief, after the appellee pointed out in the answer brief that appellant's assertion of error in the brief in chief was not in accordance with the rules and difficult to understand, and the appellee was thereby hampered in its ability to address the argument in the answer brief).

**{37}** Based on the manner in which the issues have been presented on appeal, we address two issues: (1) whether the subsection was applied retroactively, and (2) the meaning of the subsection. The district court did not grant summary judgment based on theories of impairment of a vested right or contract, and Kinder Morgan has not argued those theories on appeal as a basis to uphold summary judgment. Besides, we see no impairment of any of Kinder Morgan's property or contract rights inasmuch as the issues in this case involve severance taxes. Nor would the district court's estoppel-based theory apply under the circumstances of this case. *See Kilmer v. Goodwin*, 2004-NMCA-122, ¶ 26, 136 N.M. 440, 99 P.3d 690. We hold that the regulation was not applied retroactively and that the subsection means that pipeline owners at the time of adoption of the regulation were required to use the depreciation schedule of the previous owner. In this case, the previous owner was Shell's predecessor in interest, Sun. Although there exists no evidence in the record that Shell received or was aware of a Sun depreciation schedule, Shell could have ascertained Sun's $7.9 million investment and could have approximated a depreciation schedule based on that investment. Kinder Morgan cannot, based on Shell's failure to abide by the regulation, be excused from enforcement of the regulation.

**D.      Discussion**

**1.      Retroactivity**

**{38}** Kinder Morgan argues that the interpretation of the subsection advanced by the Department would have prevented and impaired Shell's recovery of its investment in the pipeline through full depreciation deduction from tax, thereby fixing "new disabilities to past transactions" and constituting an impermissible retroactive application of the regulation. *See Howell v. Heim*, 118 N.M. 500, 506, 882 P.2d 541, 547 (1994) ("A statute or regulation is considered retroactive if it . . . requires new obligations, imposes new duties, or affixes new disabilities to past transactions."). We are not persuaded.

**{39}** The subsection permits the pipeline owner at the time of the adoption of the subsection to take advantage of a deduction for transportation expense consisting of depreciation on the pipeline or gathering system and associated equipment. This allowance relates to and affects only severance taxes due in the future. There is no argument that the subsection reached into taxes assessed before the adoption of the subsection. The subsection is prospective in its application to taxes.

**{40}** Further, as the Department points out, the subsection did not prevent Shell or, for that matter, Kinder Morgan, from continuing to use Shell's pre-1991 depreciation schedule in its federal and state income tax reporting or in its financial statements. The subsection restricted only the owner's use of a depreciation schedule in calculating a deduction for transportation expense. This restriction solely affects the method by which the price of the product for severance tax purposes is calculated. We are persuaded that, with respect to depreciation expense on the pipeline or gathering system and associated equipment, the Department could lawfully initiate a method of calculating value and price for severance tax

purposes in a manner set out in the subsection. *See Howell*, 118 N.M. at 506, 882 P.2d at 547 (stating that "a statute does not operate retroactively merely because some of the facts or conditions which are relied upon existed prior to the enactment" and stating further that "[a] statute or rule is not retroactively construed when applied to a condition existing on its effective date even though the condition results from events which occurred prior to the date" (internal quotation marks and citations omitted)); *see also United States v. Carlton*, 512 U.S. 26, 33-34 (1994) (stating, in circumstances in which an estate tax statute limited the availability of a deduction for proceeds of sales of stock, that "[a]n entirely prospective change in the law may disturb the relied-upon expectations of individuals, but such a change would not be deemed therefore to be violative of due process").

**{41}**     We conclude that Shell's allocation of $45 million to the purchase of Sun's interest and any depreciation schedule established by Shell based on that investment did not preclude the Department under a retroactivity theory from requiring Shell to begin in 1991 to use a depreciation schedule based on Sun's $7.9 million investment if Shell wanted to take advantage of the depreciation deduction allowed in the subsection.

## 2.     Meaning of the Subsection

**{42}**     The question remains, what does the subsection mean?  As stated by the Department in the district court proceedings, the dispute reduces to:  "Did the adoption of [the subsection] . . . serve to validate sight unseen all depreciation schedules then in effect, or did it require all owners of pipelines at the time of its enactment to use their predecessors' depreciation schedule?"  Under either view, one depreciation schedule for the pipeline or gathering system and associated equipment was to be used after 1991 for years to come until the schedule ended—it was either the depreciation schedule of the owner at the time of the adoption of the subsection or the depreciation schedule of the previous owner.  Depending on the interpretation, a substantial amount of taxes would be at stake, as shown by the very substantial difference between the $7.9 million construction cost and the $45 million purchase price in the present case.  As indicated earlier in this opinion, this case involves approximately $840,000 in taxes just for the period at issue.

**{43}**     There is no doubt in this case that Shell had an obligation to self-declare. *See State v. Martin*, 90 N.M. 524, 526, 565 P.2d 1041, 1043 (Ct. App. 1977) ("[T]ax statutes normally are such that the taxpayer has the obligation of self-declaration of any incident which has a tax consequence."), *overruled on other grounds by State v. Wilson*, 116 N.M. 793, 867 P.2d 1175 (1994).  Implicit in a requirement to self-declare is an obligation to assess one's tax obligation under applicable tax law.  In the present case, we are unable to give Shell a stamp of approval in choosing either to ignore the language of the subsection or to interpret the language as it wished.  Indeed, we note that Kinder Morgan states that "Shell did not recognize a need to comply with the regulation."

**{44}**     The subsection was adopted to minimize, beginning in 1991, inflation of price and expense in successive purchases.  Based both on the pre-1991 history of the process for

14

deducting expense from price and the language of the subsection, in our view the subsection can reasonably be read in only one way. The subsection put Shell and Kinder Morgan on notice that the Department wanted and adopted a uniform process for determination of value and price for taxation purposes. The subsection also put Shell and Kinder Morgan on notice that this uniform process required present owners to use or to switch to the depreciation schedules of their predecessors. *See Clark v. Lovelace Health Sys., Inc.*, 2004-NMCA-119, ¶ 14, 136 N.M. 411, 99 P.3d 232 ("When language in a statute . . . is unambiguous, we apply it as written, and any alteration of that language is a matter for the legislature, not for this Court."). Kinder Morgan in fact interpreted the subsection to require it to use its predecessor's depreciation schedule, and we find it difficult to accept arguments that Shell should not have interpreted the regulation in the same way and that Kinder Morgan had no reason to see through Shell's having ignored the regulation.

**{45}**  The concern about interpreting the subsection in the Department's favor is the burden it placed on the present owner to have known or determined the previous owner's depreciation schedule. But that concern is insufficient for us to conclude that the subsection should be interpreted in favor of Kinder Morgan. We do not perceive an excessively burdensome process. If neither the Department nor the owner is able to discover the previous owner's depreciation schedule or to discover the previous owner's investment in the pipeline subject to depreciation, we assume that the Department and the owner would attempt to negotiate and reach agreement on a depreciation schedule. Kinder Morgan could have inquired of Shell and the Department whether Shell was using its predecessor's depreciation schedule and whether either had or could obtain Sun's investment information.

**{46}**  While the subsection could have been more carefully written, we believe that it can and should be read to mean and say that pipeline owners at the time of adoption of the subsection in 1991 were obliged to use the depreciation schedules of their predecessors if they wanted to take advantage of the depreciation expense in the subsection.

**3.      Summary of Points**

**{47}**  Based on the foregoing we hold that the subsection was not retroactively applied and that the subsection says and means that an owner at the time of the adoption of the subsection was required to follow its predecessor's depreciation schedule in taking advantage of the deduction for transportation expense made available in the subsection. In the present case, the subsection was not applied retroactively because the Department's assessment of taxes did not restate or revise taxes due before the adoption of the subsection. Instead, only the method of calculating value and price was changed. Looking at the language of the subsection, the only reasonable reading is that the Department intended to regulate value and price by instituting a uniform methodology that started with the depreciation schedule of the owner's predecessor in interest.

**CONCLUSION**

15

**{48}** We adopt the United States Supreme Court's definition in *Pioneer* of "excusable neglect," and we hold that the district court did not abuse its discretion in granting Kinder Morgan's motion to vacate the Rule 1-041(E)(2) dismissal under Rule 1-060(B)(1) in this case. We further hold that the district court erred in determining that Shell and Kinder Morgan were not required by Regulation 3.18.6.9(H)(4) to use the depreciation schedule of Shell's predecessor, Sun, or to use a depreciation schedule based on Sun's investment in the pipeline. We therefore reverse the district court.

**{49}** **IT IS SO ORDERED.**

 

 

_____

**JONATHAN B. SUTIN, Chief Judge**

 

**WE CONCUR:**

 

_____

**LYNN PICKARD, Judge**

 

 

_____

**RODERICK T. KENNEDY, Judge**

 

**Topic Index for** *Kinder Morgan CO2 Co v. NM Taxation & Revenue Dept.,* **No. 27,734**

| | |
|---|---|
| **AL** | **Administrative Law and Procedure** |
| AL-LI | Legislative Intent |
| | |
| **CP** | **Civil Procedure** |
| CP-EN | Excusable Neglect |
| CP-MD | Motion to Dismiss |
| CP-SJ | Summary Judgment |
| | |
| **TX** | **Taxation** |
| TX-ST | Severance Tax |